IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CLARENCE FISHER,<br><br>  Plaintiff,<br><br>vs.<br><br>ALEJANDRO N. MAYORKAS, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>  Defendant. | CASE NO. 4:21-cv-338<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Clarence Fisher (hereinafter "Plaintiff" or "Fisher"), in support of his Complaint and Jury Demand against Defendant Alejandro N. Mayorkas, Secretary, United States Department of Homeland Security, pleads and states as follows:

## I.   INTRODUCTION

1. This is an action by the Plaintiff against the Defendant alleging that Plaintiff was discriminated against and harassed because of his race in violation of federal Title VII.

## II.   PARTIES

2. Plaintiff was at all material times hereto a citizen of Polk County, Iowa, and an employee of the Department of Homeland Security, Transportation Security Administration.

3. Pursuant to 42 U.S.C. § 2000e-16(c), Secretary Alejandro N. Mayorkas is the Secretary of the Department of Homeland Security and is the proper named Defendant to this action involving Title VII race discrimination and harassment claims of an employee of the Department of Homeland Security, Transportation Security Administration.

### III. JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

5. Pursuant to 42 U.S.C. § 2000e-5(f)(3), Venue is appropriate in this court as the unlawful employment practices alleged occurred within the Southern District of Iowa, Central Division, and more specifically, within the City of Des Moines, Iowa.

### IV. PROCEDURAL PREREQUISITES

6. Plaintiff timely filed his administrative complaint with the Agency and with the Equal Employment Opportunity Commission and was issued a final agency decision.

### V. FACTS

7. Plaintiff began working for the Transportation Security Administration ("TSA") on approximately September 9, 2002 as a Transportation Security Officer (TSO), located in Des Moines, Iowa and is still employed with TSA.

8. Over the years, Plaintiff has held various roles within the federal government, and specifically for TSA, including TSO, Lead TSO, Supervisory TSO, Transportation Security Manager, Training Specialist, and is currently an Assistant Federal Security Director-Generalist.

9. Plaintiff has received generally positive job feedback his entire career for TSA.

10. Plaintiff has not received any discipline or write ups during his career for TSA.

11. Plaintiff has consistently received high marks as part of performance evaluations over his career.

12. Plaintiff identifies as an African American and describes his skin color as black/brown.

13. Plaintiff's job responsibilities as Assistant Federal Security Director when he began in the position included: Program oversight and management of four lines of business:

Scheduling, Coordination Center, Training, and Transportation Security Specialists – Explosives (TSS-E). Additionally, he is the program manager for the Network Information Officer (NIO), Threat Awareness Countermeasure Training (TACT) and the Field Evaluation Testing Program. Further, he is responsible for a host of other miscellaneous tasks and duties for the state of Iowa.

14. On or about August 16, 2018, Plaintiff accepted a promotion to the job he now holds, Assistant Federal Security Director- Generalist, contingent upon receiving a 3% raise to his salary, or in TSA terms, a 3% "in band increase" ("IBI") in connection with this promotion.

15. After Plaintiff received news of the promotion and associated IBI, Plaintiff confirmed that he would be receiving the 3% IBI with human resources officer Tricia Mootz.

16. Mootz told Plaintiff that she confirmed with then Federal Security Director David Dailey that Plaintiff would be receiving the 3% IBI after 90 days.

17. Mootz also told Plaintiff that she had confirmed the 3% IBI with the acting Federal Security Director, John Bright, as Dailey was scheduled to take a new position in Chicago and was not going to be the Federal Security Director managing Plaintiff when the IBI would go into effect.

18. On or about August 14, 2018, John Bright became the acting Federal Security Director for Des Moines and, as such, was Plaintiff's new direct supervisor.

19. Bright is Caucasian.

20. Plaintiff's promotion to Assistant Federal Security Director-Generalist was effective on September 2, 2018.

21. The IBI was scheduled to go into effect on December 2, 2018.

22. However, Plaintiff did not receive the IBI as promised.

23. In addition, upon receiving his promotion, Plaintiff did not receive any training for his new position.

24. Plaintiff's predecessor, Nicholas Menke, was charged with training Plaintiff and told Plaintiff that he would train him.

25. Menke is Caucasian.

26. In addition to taking over Menke's former job responsibilities, Plaintiff also absorbed oversight of the Scheduling Department from a different employee, Assistant Federal Security Director Todd Ginther.

27. Ginther is Caucasian.

28. On or about September 18, 2018, Plaintiff met with Ginther attempting to ensure a positive handoff of Ginther's scheduling responsibilities to Plaintiff.

29. Ginther told Plaintiff that he "really never had the chance to learn what they do," even though he had been tasked with oversight of the Scheduling Department for more than a year.

30. Plaintiff sought Bright's assistance with respect to Ginther's reticence and Bright attempted to make an excuse for Ginther saying that "everyone knows" that "Ginther did not do the Scheduling Department any justice."

31. In addition, Plaintiff is aware that within the Agency, it is typical for an employee taking over someone else's position to train by shadowing that person for a period of time, such as a couple of weeks.

32. Plaintiff was not offered training or shadowing by either Ginther or Menke.

33. For example, on October 23, 2018, Plaintiff noticed Menke, who had been promoted to Assistant Federal Security Director for Screening, working very hard on something.

34. Plaintiff asked him what he was working on and Menke replied that he was working on the performance goals for the managers that reported to him.

35. Menke explained that they had to be re-written because the TSA Strategic Plan had been updated.

36. Plaintiff asked him if he would need to update the performance goals for his direct reports/managers and Menke told him he did.

37. Plaintiff had not otherwise been told that this was something that needed to be done and Plaintiff was forced to learn and undertake the process by the deadline, October 31, 2018, approximately one week away.

38. Only after Plaintiff requested it, Menke sent Plaintiff the prior year performance goals for Plaintiff's new direct reports, which Plaintiff needed in order to complete the updating process.

39. On or about November 19, 2018, Plaintiff had a call with Menke in which he was discussing need for additional help and support and Menke replied "I don't wake up in the morning thinking about what Clarence Fisher needs."

40. At that point, Plaintiff believed it was clear he could not rely on Menke's support.

41. Plaintiff found it strange to receive a response like that from Menke because, prior to Plaintiff's promotion, Plaintiff had considered himself friends with Menke.

42. After Plaintiff's promotion, Menke treated him differently than he had treated Plaintiff in the past.

43. Plaintiff was not alone in his perception of Menke.

44. Testimony obtained by the investigator assigned to investigate Plaintiff's claims of discrimination within the Agency reveals that another African American employee testified

that Menke similarly refused to help train her in a new supervisory/management position that she had obtained.

45.     This African American employee also testified that she observed that Menke was harder on two African American supervisors than he was on Caucasian supervisors.

46.     The same African American employee testified that Menke was "unnecessarily harsh" with these African American supervisors.

47.     In addition, this African American employee, in response to a question by the investigator as to whether she felt her race or color were factors in how Menke treated her, identified race and sex as bases for different treatment, noting that Menke "made little remarks about Black people or Black culture."

48.     On February 4, 2019, Plaintiff spoke with Mootz regarding the 3% IBI and advised her that he had not received it.

49.     Mootz said she would follow up on the IBI, but Plaintiff never heard back.

50.     In early March 2019, Plaintiff followed up a second time with Mootz regarding the IBI he had been promised but still had not received.

51.     Mootz again told Plaintiff she would get back to him.

52.     On or about March 8, 2019, Plaintiff met with Federal Security Director Bright to discuss a topic unrelated to the IBI.  However, during the conversation, Bright brought up the IBI.

53.     Bright said, "that reminds me, about your 3% IBI," and then Bright told Plaintiff that he, Bright, had "messed up" and that Bright had already spent the money that could have been allocated to the IBI on fiscal year 2018 performance awards.

54. Bright said he had forgotten about the IBI and that he would "make it right" by awarding Plaintiff a time off award or something else, but one way or another he would fix it.

55. Bright also said he had gone to the Regional Office to attempt to get funds for the IBI but was told by the Regional Office that there was no extra money available.

56. On or about March 10, 2019, Plaintiff sent Bright an email asking to speak with him concerning available options to make up for the IBI.

57. On or about March 11, 2019, Plaintiff met with Bright and explained that he was not interested in a time off award.  Bright said he understood.

58. Plaintiff asked if his IBI could be awarded out of the fiscal year 2019 performance awards and Bright said that may be an option.

59. Bright said that he had not then received the budget yet but that once he received the budget he would "figure it out."

60. On or about April 23, 2019, Plaintiff met with Bright for his mid-year review.

61. Plaintiff discussed with Bright that while he was attempting to do all of the responsibilities assigned to him with little to no training, it was very stressful for him.

62. Bright acknowledged during the meeting that Plaintiff had the heaviest workload.

63. Plaintiff discussed the various job responsibilities and how they were divided between the other Assistant Federal Security Director, Ginther, and Plaintiff.  Plaintiff had four work intensive lines of business and Ginther had two.  In addition, Ginther had three dedicated support staff whereas Plaintiff had none.

64. This division of responsibilities was different from how the responsibilities had been divided prior to Plaintiff's promotion.

65. Prior to Plaintiff's promotion, the two Assistant Federal Security Directors shared responsibilities evenly, and each was responsible for three lines of business.

66. Plaintiff explained to Bright that he was doing his best and fulfilling his responsibilities but that it was negatively impacting his health.

67. Bright told Plaintiff he would transfer some of his job responsibilities to another employee.

68. However, Bright failed to follow through on this promise.

69. Bright also regularly undermined Plaintiff's authority with his direct reports.

70. For example, Plaintiff is responsible for internal testing of TSA screening employees in the State of Iowa.

71. On one occasion, Bright failed to inform Plaintiff of a test that had been done and the results of that test which were important to Plaintiff's ability to perform the internal auditing aspect of his job.

72. Plaintiff discovered that the internal test had been completed in a management meeting when Plaintiff was discussing the possibility of such a test only to have a manager tell him that it had already occurred.

73. Also in June, 2019, On or about June 19, 2019, one of Plaintiff's (Caucasian) colleagues was sent to Washington D.C. to participate in a Field Evaluation Test Focus Group.

74. Plaintiff asked Bright why his colleague was sent to this focus group when Plaintiff was the Field Evaluation Test Coordinator for the State.

75. Bright told him that the Regional Program Analyst at the time had made the decision.

76. On or about August 5, 2019, within the context of a discussion regarding certain time off awards Bright was making, Bright again confirmed he would honor the IBI.

77. However, the IBI was not forthcoming.

78. Bright's failure to pay the IBI, the undermining of Plaintiff's authority, Plaintiff's heavy workload, and the lack of training were not the only issues Plaintiff faced.

79. Throughout his time as Assistant Federal Security Director, Plaintiff has also been excluded by Bright and by his colleagues.

80. Plaintiff often heard Bright, Menke, and Ginther in the hallway discussing traveling and leaving together to go on business trips. Plaintiff was never included in those discussions or plans.

81. In addition, Plaintiff was not selected to be acting Federal Security Director when Bright was absent.

82. Being selected to perform the role of Federal Security Director in Bright's absence, while temporary, was an opportunity to further develop leadership skills, network with Regional and Headquarters contacts, was an honor, a privilege, and a learning opportunity which Plaintiff would have liked to perform.

83. Plaintiff's Caucasian peers were selected to be acting Federal Security Director in Bright's absence.

84. Plaintiff's annual performance review occurred on October 29, 2019 with Bright.

85. During this performance review, Bright made no mention of the IBI.

86. To date, Plaintiff has still not received the IBI promised to him on August 16, 2018, although he has now filed a formal complaint within the agency seeking the IBI.

87. Menke also regularly undermined Plaintiff's authority with his direct reports even though Plaintiff has addressed the issue with him multiple times.

88. The first discussion Plaintiff had with Menke regarding not undermining his authority occurred in mid-December, 2018, and despite multiple conversations, Menke's behavior continued.

89. For example, in approximately early November, 2019, Plaintiff learned that Menke had authorized managers within Menke's department and managers within Plaintiff's department to have weekly meetings without Plaintiff and Menke present.

90. Plaintiff had told Menke previously that he did not agree with this approach and believed he and Menke needed to be present during these meetings. Plaintiff was concerned that at least one of his direct reports was too easily influenced, lacked business decision making abilities, and could make decisions that were not good for the Scheduling Department, which was under Plaintiff's management.

91. Plaintiff found out that Menke had not only authorized such meetings but had informed Plaintiff's direct reports not to tell Plaintiff the meetings were occurring because Plaintiff was "too busy."

92. Changes were made during these secret meetings that Plaintiff would not have approved and which created problems within the Scheduling Department for Plaintiff to fix.

93. Ironically, however, it was apparent Menke valued the chain of command when Menke's job responsibilities were at issue.

94. On approximately October 31, 2019, Menke sent an email blast out to Plaintiff and senior leadership above Plaintiff and above Menke, including Bright, stating "If we are

going to make decisions that impact other lines of business, the right thing to do is to have the AFSD [Assistant Federal Security Director] that it impacts part of the process."

95. Menke had errantly believed, when he sent this email, that Plaintiff had given approval for his direct reports to move testing equipment/items to the baggage screening area (Menke oversees screening operations) without consulting with Menke prior to doing so.

96. Menke later learned that Plaintiff had not given those instructions and Menke had been misinformed.

97. Shortly after this email, Plaintiff learned of the secret meetings between his direct reports and Menke's direct reports that Menke organized behind his back.

98. The unfair and harassing treatment Plaintiff was experiencing took a toll on Plaintiff's physical and mental health.

99. Plaintiff's doctor doubled his blood pressure medication and prescribed an antidepressant.

100. In addition, after consultation with his family doctor, Plaintiff went on leave on November 4, 2019.

101. On or about November 29, 2019, Plaintiff filed a complaint of race discrimination and harassment based on race within the Agency.

102. Plaintiff returned from leave on February 18, 2020.

103. On approximately February 27, 2020, Plaintiff's workload was finally adjusted. Bright sent Plaintiff an email notifying him that he was realigning the TSS-E's under screening operations. He instructed Plaintiff to work with Menke to transition the employees and close out their performance plans. The transfer of the TSS-E's did help balance the workload.

104. This realignment took place a year after the initial discussion about uneven distribution of workloads and only after Plaintiff filed a complaint within the agency.

105. However, Plaintiff still has not received the IBI he was promised in August of 2018.

106. In more than 19 plus years of working for the federal government, Plaintiff has never known of any employee who did not receive a promised IBI associated with a promotion.

107. Further, Plaintiff continues to be excluded and treated differently from his Caucasian peers.

108. Plaintiff's otherwise long and successful career with TSA has been tainted by the disparate treatment and harassment he has experienced, and he has suffered both economically and emotionally.  In addition, Plaintiff does not want other minorities within the agency to experience what he has experienced and therefore files this lawsuit.

## VI.     CLAIM

**RACE AND/OR COLOR DISCRIMINATION AND HOSTILE WORK ENVIRONMENT HARASSMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e,** *et seq.*

109. Plaintiff incorporates paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110. Under the provisions of Title VII of the Civil Rights Act, as amended, it is unlawful for an employer to discriminate against an employee on the basis of race, and/or color.

111. Under the provisions of Title VII of the Civil Rights Act, as amended, it is unlawful for an employer to harass an employee on the basis of race, and/or color.

112. Plaintiff is African American and has black/brown skin.

113. Plaintiff was, at relevant times, an employee of Defendant within the meaning of Title VII of the Civil Rights Act, as amended.

114. Defendant is an employer within the meaning of Title VII of the Civil Rights Act, as amended.

115. Defendant's actions in treating Plaintiff differently based on his race, including through refusing to give him the raise he was promised, constitute race and/or color discrimination in violation of Title VII of the Civil Rights Act, as amended.

116. Defendant's actions in harassing Plaintiff based on his race by subjecting him to a hostile work environment are in violation of Title VII of the Civil Rights Act, as amended.

117. As a proximate result of Defendant's actions, as outlined above, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

118. Defendant's acts are in violation of the federal Civil Rights Act, Title VII, 42 U.S.C. § 2000 *et seq.*, and have been carried out with malice or reckless indifference to Plaintiff's federally protected rights.

119. Plaintiff has been damaged as a proximate result of this violation and requests relief as set forth below.

## VII.   **RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment and seeks the following relief:

A.   An adjudication that Defendant engaged in disparate treatment of Plaintiff and harassed Plaintiff which constituted unfair and/or discriminatory practices within the meaning of 42 U.S.C. 2000e *et seq.*;

B.   An award of back pay, front pay, and benefits pursuant to 42 U.S.C. 2000e *et seq.*;

C. An award of compensatory damages, including emotional pain, suffering, inconvenience and mental anguish, pursuant to 42 U.S.C. 2000e *et seq.*;

D. An award of pre-judgment interest as provided by law;

E. An award of punitive or exemplary damages, as allowed by law;

F. An adjudication that Plaintiff is entitled to equitable relief in the form of orders and injunctive relief requiring Defendant to do the following:

   (i) Provide training to supervisory employees regarding how to effectively avoid discrimination in employment on the basis of race or color and to report to the court once every six months for a period of three years on the training provided and on its effectiveness;

   (ii) Require that all disciplinary decisions regarding employees employed by Defendant in Iowa be reviewed by an independent EEO agency for compliance with EEO laws and regulations prior to implementation;

   (iii) Monitor the environment in workplaces operated by Defendant in Iowa to assure that employees are not being treated unfairly based on race or color and report annually to the court for a period of three years on its monitoring; and

   (iv) Test and evaluate supervisory employees working for Defendant in Iowa to assure that they do not exhibit or act upon bias against the disabled or bigoted attitudes and opinions, do not tolerate disparate treatment based on race or color by their subordinates, and report annually for a period of three years on its testing and evaluating.

G. An adjudication that Plaintiff is entitled to reasonable attorney's fees and costs pursuant to 42 U.S.C. 2000e *et seq.*, as well as interest allowed by law and the costs of this action; and

H. Award such other and additional relief as the Court may deem just and proper.

## VIII.  JURY DEMAND

Plaintiff hereby demands a jury trial for all claims alleged herein.

Respectfully submitted,

 /s/ *Megan Flynn*
Michael Carroll AT0001311
Megan Flynn AT0010000
COPPOLA, McCONVILLE, CARROLL,
HOCKENBERG & FLYNN, P.C.
2100 Westown Parkway, Suite 210
West Des Moines, Iowa 50265
Telephone: (515) 453-1055
Facsimile: (515) 453-1059
Email: michael@wdmlawyers.com
          megan@wdmlawyers.com
ATTORNEYS FOR THE PLAINTIFF